IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DASFORTUS TECHNOLOGIES, LLC,       )
                                   )
    Plaintiff,                     )
                                   )
v.                                 )       Case No. 3:07-cv-0866
                                   )       Judge Trauger
PRECISION PRODUCTS MANUFACTURING )
COMPANY, LTD (HONG KONG);          )
PRECISION PRODUCTS                 )
MANUFACTURING, LTD (PRC); and      )
FTEC MANUFACTURING COMPANY,        )
LTD (PRC),                         )
                                   )
    Defendants.                    )

## MEMORANDUM

The court conducted a two-day bench trial of this case on September 20-21, 2011. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court sets forth herein its findings of fact and conclusions of law.

## FINDINGS OF FACT

The plaintiff, DASFortus, Technologies, LLC ("DASFortus") outsources metal components as an independent buyer and manufacturer's representative.[1] It was formed on September 1, 2005, and has two members, Fortus Technologies, Inc. ("Fortus") and Kealyn, LLC. On August 24, 2005, Fortus contributed all of its assets to DASFortus, including its buy-

---

[1] No official transcript of the bench trial has been prepared, and, unless otherwise indicated, all references to the testimony are from the court's memory and notes. In making its findings of fact, the court also consulted the proposed findings of fact and conclusions of law submitted by both parties.

1

sell and manufacturer's representative business.  As an independent buyer, DASFortus contracts with a manufacturer to purchase component parts and then sources those parts to other companies.  In its capacity as a manufacturer's representative, DASFortus solicits wholesale orders and is compensated through commission.  The defendant, Precision Products Manufacturing Company, Ltd. (Hong Kong) ("PPM (HK)"), engages in the business of machining, fabricating, and assembling metal components.[2]  PPM (HK) was formerly known as FTEC Manufacturing Company Limited ("FTEC").

The parties' business relationship began sometime in either 2003 or 2004, when DASFortus began supplying a variety of component parts to a company operating under the name of Whiteman.  Acting as an independent buyer, DASFortus solicited companies to manufacture parts that it would later sell to Whiteman.  PPM (HK) was one such company, and it manufactured parts called "trowel arms" and "spiders" and sold them to DASFortus for resale to Whiteman ("the Whiteman business").

DASFortus also worked with PPM (HK) as a manufacturer's representative.  In this capacity, DASFortus introduced PPM (HK) to Stanadyne Corporation ("Stanadyne") and its wholly-owned subsidiary, Precision Engine Products Corp. ("PEP-C").  PEP-C manufactures valve train components and assemblies and has a manufacturing facility in Tallahassee, Florida.

---

[2] The corporate identity of PPM (HK) and other PPM entities has been at issue throughout this litigation.  Citing PPM (HK)'s inconsistent and unclear statements about its corporate identity (which continued at the trial), the court has noted that the defendant's statements and actions in this litigation support the conclusion that a corporate shell game is afoot.  (*See* Docket No. 43, at 11, n.9; Docket No. 93, at 7.)  Accordingly, the court shall treat all PPM entities as one defendant, PPM (HK).

PEP-C was seeking to source component parts to an overseas supplier and, through the plaintiff's efforts, developed a business relationship with PPM (HK).

On approximately September 6, 2004, DASFortus and PPM (HK) entered into an agreement known as the Stanadyne Commission Contract ("Commission Contract").[3] This contract formalized the terms of the manufacturer's representative relationship between the two parties. The initial term of the Commission Contract was five years, but it was subject to automatic renewals.[4] (Plaintiff Exhibit 3.) The contract was to be construed in accordance with Tennessee law. (*Id.*)

Under the Commission Contract, PPM (HK) agreed to engage DASFortus as a sales representative handling the sale of PPM (HK)'s goods to the customers set forth in Exhibit A to the agreement. (Plaintiff Exhibit 3.) In return, DASFortus agreed to "sell the goods manufactured by [PPM (HK)] and ... devote such time and efforts in the sale of such goods as may be required." (*Id.*) Exhibit A to the Commission Contract, entitled "Customers," listed Stanadyne Corporation and stated that "[i]t is agreed and understood that all Stanadyne facilities and plants are part of this agreement." (*Id.*) At the time the Commission Contract was executed, PEP-C was a wholly-owned subsidiary of Stanadyne and its facility in Tallahassee, Florida was a Stanadyne facility.

Article 3 of the Commission Contract outlined how new customers could be added to the

---

[3] The contract apparently was signed in counterparts, as DASFortus signed the contract on August 31, 2004, while PPM (HK) signed it on September 6, 2004. (Plaintiff Exhibit 3.)

[4] Specifically, the Commission Contract stated that "it shall automatically renew equally with new agreements between FTEC and Stanadyne." (Plaintiff Exhibit 3.) As previously noted, FTEC was the predecessor of PPM (HK).

agreement, providing, in pertinent part:

> The Sales Representative shall have the exclusive right to sell the services of the Principal to those firms set forth in Exhibit A. All companies presented by Sales Representative and accepted by the Principal will become a part of the conditions of this Agreement. New companies can be added to this [sic] and/or existing companies can be deleted from this Agreement only by mutual consent. The territory assignment can be changed only by mutual consent. The consent in every instance must be in writing.

(Plaintiff Exhibit 3.) The contract also contained provisions regarding termination. For example, under Article 4(b), PPM (HK) had the right to immediately terminate the Commission Contract upon the death of the sales representative or, among other things, if DASFortus sold "competitors [sic] parts to the representative's customer conflicting the Principle interest [sic]." (*Id*.) If PPM (HK) terminated the contract pursuant to any of the grounds contained in Article 4(b), it had the right to terminate commission payments. (*Id*.) Otherwise, unless the sales representative terminated the Commission Contract, PPM (HK) was obligated to "pay commission[s] as long as continue [sic] to supply the life of parts to [sic] representative's customers." (*Id*.)

Article 5 of the Commission Contract provided that, in consideration of the services that it performed, DASFortus would receive commissions as outlined in Exhibit B to the agreement. (Plaintiff Exhibit 3.) Exhibit B, in turn, provided that the commission rate on all quotes presented was 10%. (*Id*.) Exhibit B also contained a sliding-scale commission structure. (*Id*.) Thus, on each and every new part number, the commission rate for years one and two of full production was 10%; for years three and four, it was 7.5%; and for years five and thereafter, it was 5%. (*Id*.) Each year was deemed to begin at the time of the "first full production shipment."

(*Id*.)  DASFortus was to receive payment for commissions no later than fifteen days after goods were shipped by PPM (HK) and invoices were paid.  (*Id*.)  Finally, commissions did not include tooling and freight charges, "unless agreed upon by both parties."  (*Id*.)

On approximately December 13, 2004, DASFortus, PPM (HK), and PEP-C entered into a Manufacturing and Supply Agreement ("MSA").[5]  Under the MSA, PPM (HK) agreed to manufacture certain component parts for sale to PEP-C.  (Plaintiff Exhibit 5.)  PPM (HK) specifically agreed to manufacture part number "C1282," a "12mm LR/PL Cartridge Body." (*Id*.)  The MSA allowed the parties, through mutual written consent, to add components to the agreement.[6]  (*Id*.)

The MSA also memorialized the fact that DASFortus, as PPM (HK)'s local U.S. representative, "facilitated the relationship among the parties contemplated" by the agreement. (Plaintiff Exhibit 5.)  Moreover, section 3.2(g) required that PPM (HK) "pay all fees,

---

[5] The MSA contained a choice of law clause providing that the agreement would be governed by and construed in accordance with Connecticut law, without giving effect to Connecticut's conflict of law rules.  (Plaintiff Exhibit 5.)  It also contained a choice of forum clause that selected Connecticut as the forum for any disputes arising under the agreement.  (*Id*.)

[6] For instance, Section 2.4. of the MSA provides that:

> The Product covered by this Agreement will consist of the following hydraulic lash adjusters and related components, and hydraulic cartridges, as specified in the print specification listed below or in supplemental specifications mutually approved by the parties in writing: Any subsequent mutually agreed components will be added to this list.

(Plaintiff Exhibit 5.)

commissions and other amounts payable to [DASFortus] in connection with this Agreement and Product sales." (*Id*.)

The initial term of the MSA was five years, subject to PEP-C's right to renew the agreement for additional terms. (Plaintiff Exhibit 5.) The MSA was also assignable by any party to the agreement. (*Id*.) In particular, section 7.3 of the MSA provided, in pertinent part:

> [A]ny party may assign this Agreement to an assignee of all or substantially all its assets and business, provided the assignee agrees in writing to be bound by this Agreement on the same terms as the assignor beginning on the date of assignment, whereupon the assignor shall be relieved from liability or obligation under this Agreement for periods after the date of assignment (but not with respect to prior periods).

(*Id*.)

In April of 2005, DASFortus, PPM (HK), and PEP-C amended the MSA to add additional products in a document entitled "First Amendment to Manufacturing and Supply Agreement" ("Amendment"). (Plaintiff Exhibit 6.) In the Amendment, PEP-C also agreed to provide certain equipment ("Davenport Machines") to PPM (HK). (*Id*.) DASFortus arranged for the shipment of the Davenport Machines to PPM (HK) and incurred the associated freight charges. PEP-C eventually purchased additional parts from PPM (HK), as their business relationship developed. On August 25, 2005, all three parties signed an Addendum to the MSA. The Addendum recognized that PPM (HK) was investing additional capital and resources in order to grind components for PEP-C and extended the length of the MSA. (Plaintiff Exhibit 7.)

On July 31, 2006, PEP-C sold substantially all of its assets ("the asset sale"), including its machinery, equipment, manufactured parts, purchased parts, contracts, Tallahassee manufacturing facility, and name to Defiance, Inc., a wholly-owned subsidiary of GenTek, Inc.

("GT").[7]  (Plaintiff Exhibit 10.)  Pursuant to this asset purchase agreement, GT agreed to assume all liabilities under the MSA.  (*Id.*)  PEP-C notified PPM (HK) of the asset sale and the assignment of the MSA through a letter sent on July 13, 2006 to Frank Zhu, PPM (HK)'s General Manager.  (Plaintiff Exhibit 11.)  DASFortus did not learn of the sale until it happened.

Although PEP-C had a different corporate parent following the asset sale, the substantive business relationship between itself, PPM (HK), and DASFortus remained unchanged.  PEP-C continued to issue purchase orders to PPM (HK), PPM (HK) continued to manufacture component parts for PEP-C, and DASFortus continued to receive commissions from PPM (HK) for the sales it made to PEP-C.[8]

The manufacturer's representative relationship between DASFortus and PPM (HK) also remained unchanged following the asset sale, as both parties continued to work together to maintain the PEP-C business.  For instance, on August 30, 2006, DASFortus President Josh Sutherland accompanied Simon Zhu of PPM (HK) on a trip to Tallahassee, Florida to meet with PEP-C officials, tour production lines, and discuss PEP-C's future requirements.[9]  (Plaintiff

---

[7] After the asset sale, Defiance, Inc. changed its name to GT Technologies, Inc. following a December 2008 merger.  (Docket No. 136, at 4.)  Whereas before the merger, GT Technologies, Inc. was an operating division of GenTek, now GT Technologies, Inc. is a separate corporate entity.  (*Id.*)  For the purposes of this memorandum, the court will refer to the purchaser of PEP-C's assets as "GT."

[8] In a prior Memorandum and Order, the court noted the substantial confusion surrounding precisely which entity, GenTek, Inc., GT, Defiance or PEP-C, placed orders with PPM (HK) following the July 2006 asset sale.  (Docket No. 136, at 4.)  For the sake of simplicity, the court shall refer to the entity that continued to issue purchase orders for component parts to PPM (HK) as "PEP-C."

[9] In addition, following the asset sale, on August 10, 2006, DASFortus CEO Thomas Murphy accompanied PPM (HK)'s General Manager, Frank Zhu, on a trip to Perrysburg, Ohio

Exhibit 13.)  Later, in November 2006, DASFortus CEO Thomas Murphy accompanied Frank

Zhu on a second trip to Tallahassee.  (Plaintiff Exhibit 20.)  In addition to these trips, DASFortus

arranged regularly scheduled conference calls between itself, PPM (HK), and PEP-C that

continued well after the asset sale.  (Plaintiff Exhibit 24.)  PPM (HK) also continued to engage

DASFortus to help it resolve issues with PEP-C and achieve sales forecasts in connection with

the PEP-C business.  For example, on November 6, 2006, Frank Zhu emailed both Sutherland

and Murphy to discuss, among other things: (1) how PPM (HK) and DASFortus could work to

resolve quality issues and other difficulties arising with the PEP-C business; (2) whether

DASFortus could assist PPM (HK) in locating an engineer near Tallahassee to serve the PEP-C

business; and (3) the 2007 sales forecast for business with PEP-C and the figures contained in an

attached document entitled "D.A.S. Fortus Sales Priority 2007."  (Plaintiff Exhibit 19.)

DASFortus also advised PPM (HK) on certain issues arising in connection with the PEP-C

business.[10]

On November 6, 2006, Frank Zhu emailed Sutherland and Murphy to address several

aspects of the business relationship between PPM (HK) and DASFortus. (Plaintiff Exhibit 19.)

Among other things, he sought to renegotiate the Commission Contract between PPM (HK) and

DASFortus.  (*Id*.)  In particular, he wanted to renegotiate the commission rates on the PEP-C

business and re-sign the agreement in light of the asset sale to clarify how the parties would

---

to meet with Scott Bohen of GT to discuss business opportunities.  (Plaintiff Exhibit 14.)

[10] For instance, on December 13, 2006, Thomas Murphy emailed Frank Zhu, among others, to outline items PPM (HK) should consider before agreeing to new policies and procedures that GT had sent to all of its suppliers, including PPM (HK).  (Defense Exhibit 16.)

address Stanadyne's other divisions, as well as any new business with GT's other divisions. (*Id.*) Mr. Zhu also expressed his desire to discontinue any buy-sell business with DASFortus, except for the preexisting Whiteman business. (*Id.*) In the months leading up to this email, the Whiteman business became a source of stress for both parties, due to quality issues plaguing many of PPM (HK)'s shipments of trowel arms.

On November 27, 2006, Murphy responded to Zhu's proposals via email. (Plaintiff Exhibit 21.) Murphy stated that DASFortus was willing to negotiate on some of Zhu's proposals, particularly with respect to some of the commission rates. (*Id.*) He also reminded Zhu that PPM (HK) owed DASFortus $17,610.00 in equipment freight charges[11] for the previous shipment of Davenport Machines made by DASFortus. (*Id.*) In particular, he referenced an agreement between the parties whereby PPM (HK) agreed to pay the freight bill on the condition that DASFortus submitted certain tooling money owed to PPM (HK).[12] (*Id.*) DASFortus paid the tooling money but has yet to receive reimbursement from PPM (HK) for the freight charges. Finally, Murphy notified Zhu that, due to lingering quality issues with the production of trowel arms, DASFortus decided to source business for a new trowel arm design introduced by

---

[11] It appears that Murphy, in his email, mistakenly stated that $17,210.00 was due. As prior emails and meeting minutes demonstrate, however, the parties agreed that PPM (HK) would reimburse DASFortus $17,610.00 on the condition that plaintiff submitted certain tooling money owed to the defendant.

[12] The terms of that agreement are also contained in PPM (HK)'s September 7, 2006, meeting minutes attached to a November 1, 2006, email from Murphy to Frank Zhu, among others, confirming that PPM (HK) received the final installment of the tooling money. (Plaintiff Exhibit 18.)

Whiteman to a different supplier.[13]  (*Id*.)  Murphy added that he hoped to work with PPM (HK) in phasing out business regarding the old trowel arm design.  (*Id*.)

The next day, Zhu replied to Murphy and accused DASFortus of breaching the Commission Contract by sourcing a portion of the Whiteman business to another supplier. (Plaintiff Exhibit 23.)  He accused DASFortus of acting dishonestly and suggested that it sent one of its representatives to take detailed pictures of PPM (HK)'s plants and processes in order to share those photos with one of PPM (HK)'s competitors (the new supplier for trowel arms). (*Id*.)  He also added that he would not discuss any other aspects of the business relationship with DASFortus until both parties resolved the issues concerning the Whiteman business.  (*Id*.)

Following this email, Zhu chose not to invite Murphy to participate in the conference calls that were held with PEP-C.  (Plaintiff Exhibit 24.)  In addition, PPM (HK) ceased paying commissions to DASFortus for component parts sold to PEP-C.  Finally, on January 11, 2007, Zhu emailed Murphy and Sutherland to inform them that PPM (HK) was terminating the Commission Contract with DASFortus.  (Plaintiff Exhibit 26.)  He cited DASFortus' decision to source a portion of the Whiteman business to a competitor as grounds for termination.  (*Id*.)

Since its termination of the Commission Contract, PPM (HK) has continued to manufacture and sell component parts to PEP-C.  It also retained other manufacturer's sales representatives.  One of those sales representatives, Davidon Industries ("Davidon"), entered

---

[13] Proof at trial revealed that Whiteman's testing of PPM (HK)'s final product was faulty and that perhaps the quality issues were, in fact, less serious than originally thought.  However, this came late in the process of DASFortus dealing with the quality issues and did not impact its decision to change suppliers for the new trowel arm.

into a Master Supply Agreement ("Davidon Agreement") with Stanadyne on December 20, 2007. (Plaintiff Exhibit 17.) Under that agreement, Davidon agreed to supply certain products to Stanadyne for purchase. (*Id*.) Although Davidon was formally the supplier under the agreement, it appears that PPM (HK) was actually selling the products to Stanadyne. The products to be supplied by Davidon under the contract were described in Exhibit A. (*Id*.) Yet, Exhibit A contained a PPM (HK) quote to Stanadyne for parts to be sold. (*Id*.) This quote was approved by Frank Zhu.[14] (*Id*.)

## CONCLUSIONS OF LAW

**I.     Liability**

The plaintiff, DASFortus, contends that the defendant, PPM (HK), breached the Commission Contract when it ceased paying commissions on its sales of component parts to PEP-C and terminated the agreement. DASFortus also asserts that PPM (HK) breached an agreement it had with the plaintiff to reimburse previously incurred freight charges. Moreover, the plaintiff contends that, to the extent PPM (HK)'s obligation to pay commissions was not reduced to writing, PPM (HK) is nonetheless liable for violating the Tennessee Commission Act (Tenn. Code Ann. § 47-50-114) (2001).[15] The defendant asserts two affirmative defenses and a

---

[14] Although it was not a formal party to the Davidon Agreement, PPM (HK) was identified in the agreement as a third party-supplier to Davidon. (Plaintiff Exhibit 17.) While the Davidon Agreement actually identified Precision Products (Shenzhen) Manufacturing Limited as the third-party supplier, the court will, pursuant to its conclusion in footnote 2, treat all of the PPM affiliates as the same entity, PPM (HK).

[15] In its Complaint, DASFortus also asserted claims for a breach of the implied duty of good faith and fair dealing and a violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-101, *et seq*.) (2001). However, during the pretrial conference, DASFortus agreed that there was no independent cause of action for breaching the duty of good faith and

counterclaim. In its counterclaim, the defendant contends that, since it was not obligated to pay any commissions to the plaintiff under the Commission Contract after GT purchased PEP-C's assets on July 31, 2006, any commissions it paid to the plaintiff following the asset sale were paid by mistake and should be returned. The court will address the merits of the plaintiff's claims and the affirmative defenses and will then turn to the defendant's counterclaim.

### A. DASFortus' Claims

#### 1) Breach of the Commission Contract

At the heart of the plaintiff's breach of contract claim is the issue of whether PEP-C continued to be within the scope of the Commission Contract after GT purchased its assets on July 31, 2006. The Commission Contract, by its express terms, is only applicable to those customers set forth in Exhibit A. The only customer listed in Exhibit A of the Commission Contract is Stanadyne Corporation and its plants and facilities. However, following the asset sale, PEP-C was no longer a part of the Stanadyne Corporation and ceased being a Stanadyne plant or facility. In addition, under the terms of the Commission Contract, a new customer could only be added by the mutual consent of DASFortus and PPM (HK) expressed in writing. Yet, no written agreement was reached by the parties whereby PEP-C as a GT-entity was added as a customer covered by the Commission Contract.

Relying on the rule of practical construction, DASFortus contends that the course of conduct between itself and PPM (HK) demonstrates that both parties intended that PEP-C would

---

fair dealing that is implied in every contract. In addition, it stated that it would no longer pursue its Tennessee Consumer Protection Act claim.

continue to remain within the scope of the Commission Contract following the asset sale. The plaintiff's reliance on this rule, however, is misplaced. The rule provides that "the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." *Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn. 1983). Yet, the rule is only applicable when the terms of a contract are indefinite or ambiguous. *Fidelity-Phenix Fire Ins. Co. of New York v. Jackson*, 181 S.W.2d 625, 631 (Tenn. 1944). DASFortus has failed to raise any ambiguity in the Commission Contract that would require the application of this rule.

Nonetheless, the evidence in the record demonstrates that both DASFortus and PPM (HK) modified the terms of the Commission Contract to include PEP-C as a new customer through their course of conduct following the asset sale. "A modification to a contract is a change to one or more contract terms which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect of the contract undisturbed." *Constr. Crane and Tractor, Inc. v. Wirtgen Am., Inc*., No. M2009-01131-COA-R3-CV, 2010 WL 1172224, at * 10 (Tenn. Ct. App. Mar. 24, 2010) (internal quotations and citation omitted). While a modification creates a new contract, the original contract continues to exist to the extent it is not altered by the modification. *Id*. "A party's agreement to a modification need not be express, but may be implied from a course of conduct;" this is true even if the contract, as in the instant case, expressly provides that the parties may only modify the agreement through mutual written consent. *Id*. Moreover, a modification must be made with the consent of both

parties and be supported by consideration. *Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *8 (Tenn. Ct. App. Dec. 22, 2009).

There is ample evidence in the record establishing that both parties consented to modify the Commission Contract following the asset sale by continuing to perform their respective contractual obligations as they pertained to the PEP-C business. Both DASFortus and PPM (HK) were aware of the fact that PEP-C was no longer a Stanadyne plant or facility following the asset sale. Notwithstanding that fact, PPM (HK) continued to pay commissions to DASFortus on parts sales to PEP-C. It also engaged DASFortus to help it resolve technical and quality issues with PEP-C and meet sales forecasts in connection with the PEP-C business. DASFortus also continued to work with PPM (HK) after the asset sale and devote its efforts to develop the PEP-C business. It accompanied PPM (HK) on multiple trips to PEP-C's Tallahassee facility, arranged and participated in regularly scheduled conference calls between PPM (HK) and PEP-C, and advised PPM (HK) regarding specific issues arising in connection with the PEP-C business. While it is true that PPM (HK)'s General Manager, Frank Zhu, attempted to renegotiate the Commission Contract, his proposals only concerned adjusting the commission rates and, in light of the asset sale, re-signing the agreement to address Stanadyne's other divisions and any new business with GT's other divisions. Notably absent from his proposals was any suggestion that the Commission Contract needed to be re-signed because it did not already cover the existing PEP-C business following the asset sale.

The record also establishes that the modification was supported by consideration. Following the asset sale, each party undertook acts that it was not legally obligated to perform.

14

*See Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985) ("It is well-settled that consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do."). Indeed, despite the fact that PEP-C was no longer a Stanadyne plant or facility, PPM (HK) continued to pay commissions to DASFortus from its parts sales to PEP-C, while DASFortus continued to devote its time and efforts to developing the PEP-C business. In sum, the evidence shows that DASFortus and PPM (HK) knowingly modified the Commission Contract following the asset sale to add PEP-C, the GT entity, as an additional customer covered by the terms of the agreement.

The defendant breached this modified Commission Contract when it ceased paying DASFortus commissions on its sales of component parts to PEP-C and terminated the agreement on January 11, 2007. It is well-settled that, in Tennessee, a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). It is evident that all three conditions are met here; that is, there was an enforceable contract, the defendant ceased paying commissions owed to the plaintiff under that contract, and there were damages caused by the breach, as DASFortus did not receive the commissions it was owed.

PPM (HK) attempts to avoid liability under the Commission Contract by asserting that DASFortus first breached the contract when it decided to source business for a new trowel arm design introduced by Whiteman to a competitor. In particular, PPM (HK) argues that such

conduct gave it the right to terminate the Commission Contract under Article 4(b),[16] a right that it asserted on January 11, 2007. This argument is without merit. By its terms, the Commission Contract only applies to those customers that are listed in Exhibit A. The only customer that is listed in Exhibit A is Stanadyne Corporation and its plants and facilities.[17] Because Whiteman was not affiliated with either Stanadyne or PEP-C, this defense must fail.

PPM (HK) next asserts that DASFortus failed to state a claim for breach of contract because PEP-C no longer remained within the scope of the Commission Contract following the asset sale, as the parties never agreed in writing to add PEP-C.[18] The court, however, has already concluded that the parties modified the Commission Contract after the asset sale to bring PEP-C within its scope. Accordingly, this defense is also without merit.

Therefore, the court finds that the defendant has no viable affirmative defenses to the plaintiff's breach of contract claim and that the plaintiff is entitled to damages for the defendant's breach of the Commission Contract. Having concluded that the defendant breached

---

[16] One of the grounds in Article 4(b) under which PPM (HK) was authorized to terminate the Commission Contract was if the sales representative sold "competitors [sic] parts to the representative's customer conflicting the Principle interest [sic]." (Plaintiff Exhibit 3.)

[17] Of course, as found herein, pursuant to the parties' modification of the Commission Contract, PEP-C became an additional customer.

[18] PPM (HK) has abandoned its affirmative defense that DASFortus was estopped by its own conduct from bringing this lawsuit. Moreover, because the plaintiff is no longer asserting a claim under the Tennessee Consumer Protection Act, there is no need to consider the defendant's affirmative defenses with respect to that cause of action.

an enforceable written contract, there is no need for the court to consider the plaintiff's

Tennessee Commission Act claim.[19]

### 2) Breach of the Agreement to Reimburse Freight Charges

In addition to breaching the Commission Contract, DASFortus also claims that PPM

(HK) breached an agreement to reimburse the plaintiff for $17,610.00 in freight charges for the

shipment of Davenport Machines that were to be used by the defendant in manufacturing

component parts for PEP-C.  Pursuant to the agreement, PPM (HK) agreed to pay the freight bill

on the condition that DASFortus submitted certain tooling money owed to PPM (HK).  PPM

(HK) does not deny that it reached this agreement.  Moreover, it does not deny that DASFortus

submitted the tooling money owed to PPM (HK).  Instead, Frank Zhu testified that PPM (HK)

should not be obligated to pay the freight charges because the plaintiff mistakenly debited the

defendant other charges in connection with the Whiteman business.  He added that those

mistaken charges should offset the amount owed to the plaintiff for freight.  However, the debits

issue concerns the Whiteman business and is unrelated to the agreement concerning the

reimbursement of the freight charges.  In sum, the plaintiff performed its end of the bargain and

the defendant has not.  Accordingly, the court finds that the defendant breached its agreement

with the plaintiff to pay the freight charges for the shipment of the Davenport Machines.


### B.    PPM (HK)'s Counterclaim

---

[19] As there is no longer any need to address the plaintiff's Tennessee Commission Act claim, the court will not consider the defendant's affirmative defense concerning that cause of action.

PPM (HK) has asserted a counterclaim against DASFortus that mirrors its second affirmative defense. Here, however, it contends that, because PEP-C was not within the scope of the Commission Contract after its assets were sold to GT, PPM (HK) is entitled to recover commissions that it mistakenly paid to DASFortus from July of 2006 through November of 2006. Yet, because the court has already determined that the parties knowingly modified the Commission Contract following the asset sale to bring PEP-C within its scope, this claim must fail.

II.    **DAMAGES**

The plaintiff seeks $658,797.58 in compensatory damages as a result of the defendant's breach of contract. It also seeks prejudgment interest dating back to November of 2006. The plaintiff's request for damages contains the following components: (1) $626,433.42 in unpaid commissions owed to the plaintiff from PPM (HK)'s sale of parts to PEP-C; (2) $12,438.76 in unpaid commissions for the sale of parts to Stanadyne under the Davidon Agreement; and (3) $19,925.40 in freight and tooling charges owed by PPM (HK) to the plaintiff. The court will address each of these components of the plaintiff's request for damages.

A.    **Unpaid Commissions**

DASFortus seeks $626,433.42 in unpaid commissions owed to it as a result of PPM (HK)'s sales of component parts to PEP-C. Under the terms of the Commission Contract, DASFortus was entitled to receive commissions for as long as PPM (HK) continued to supply the parts to the customers covered under the contract, including PEP-C. At trial, the court heard testimony from DASFortus CEO, Thomas Murphy, explaining his computation of the amount of

18

unpaid commissions PPM (HK) owed to the plaintiff on the PEP-C business.[20]  He testified that

his computation was derived from data contained in documents produced by PPM (HK) and GT.

He stated that his computation covered sales of all parts from PPM (HK) to PEP-C for which the

plaintiff had not received commissions.  He added that the commissions were calculated in

accordance with the provisions contained in Exhibit B of the Commission Contract, including

the sliding-scale commission structure. Murphy also stated that he only calculated commissions

owed through the stated five-year term of the Commission Contract.  Having considered

Murphy's testimony and having reviewed his computations, the court finds that there is

substantial evidence to support the plaintiff's request for damages arising from PPM (HK)'s

failure to pay commissions to DASFortus on its sales of component parts to PEP-C.

Accordingly, the court shall award the plaintiff $626,433.42 for these unpaid commissions.

Likewise, the court concludes that the plaintiff is entitled to recover $12,438.76 in unpaid

commissions for the sale of certain parts to Stanadyne pursuant to the Davidon Agreement.

Stanadyne is a customer that is covered by the express terms of the Commission Contract.

Moreover, while Davidon was the formal supplier under the Davidon Agreement, it appears that

PPM (HK) was actually selling the parts to Stanadyne, as evidenced by the PPM (HK) quote

attached to the agreement.  At trial, Murphy testified that his calculation of the unpaid

commission amount was derived from information contained in documents that Stanadyne

produced to the plaintiff.  He also stated that the parts sold to Stanadyne under the Davidon

Agreement were covered by the Commission Contract and that the sales were made within the

---

[20] Mr. Murphy's computations were set forth in Exhibit 33 of the plaintiff's exhibits.

five-year term of that agreement. Although Frank Zhu testified that there was no contract between the plaintiff and Davidon, he did not controvert Murphy's testimony that the parts at issue were covered under the Commission Contract.

The defendant contends that the plaintiff failed to prove its actual damages because it did not show the costs and expenses it saved following the defendant's breach of the Commission Contract. This case, however, is not a breach of contract action for anticipated future profits. Instead, the plaintiff seeks to recover commissions it earned for establishing and maintaining PPM (HK) as a supplier to PEP-C and Stanadyne prior to the defendant's breach of the Commission Contract. Thus, it seeks commissions on parts sales as per the terms of the Commission Contract, that is, for as long as PPM (HK) continues to supply the parts. Therefore, the court concludes that the defendant's contention is without merit. (*See Kingsley Assocs. v. Del-Met, Inc.*, 918 F.2d 1277, 1288 (6th Cir. 1990) (applying Michigan law and rejecting automotive parts manufacturer's contention that sales representative was only entitled to net commissions, as sales representative did not seek future profits, but rather sought commissions earned prior to termination of business relationship for life of the part).

The defendant also contends that the commission rates applied by the plaintiff in calculating its damages are incorrect for certain parts.[21] In particular, it asserts that the commission rates for such parts were either four or five percent.[22] In support of this argument,

---

[21] The specific parts the defendant refers to contain the following part numbers: C1296, C1299, C1269, C1300, C1298, C1213, C1111, C1300, C1304, and C1215.

[22] Frank Zhu also testified at trial that the normal product commission on parts sales to PEP-C was between three and five percent. However, this testimony is contradicted by an email he sent to Thomas Murphy and Josh Sutherland on November 6, 2006, where he stated that PPM

the defendant cites a copy of the Commission Contract attached to the plaintiff's Complaint as well as an unspecified email whereby the plaintiff purportedly admitted that the commission rate was five percent. The defendant's contention is without merit. First, the copy of the Commission Contract attached to the plaintiff's Complaint is different from the copy that both parties have stipulated and referred to throughout the trial. The stipulated Commission Contract clearly provides that commissions are to be paid on a sliding-scale ranging from ten to five percent. Second, it appears that the email the defendant is referring to was sent on November 28, 2006, by Thomas Murphy to Frank Zhu where Murphy states that DASFortus will not accept a five percent commission rate on certain large projects. (Plaintiff Exhibit 23.) It is clear from this email that Murphy merely referred to the five percent figure in the context of a negotiation over commission rates and, in any event, rejected the five percent figure.

Next, the defendant contends that the plaintiff is not entitled to commissions because it went out of business. For support of this contention, the defendant cites the termination provision in Article 4(b) of the Commission Contract that authorizes PPM (HK) to terminate the agreement upon the death of the sales representative. This contention is unpersuasive, because the evidence at trial established that DASFortus continues to operate as a legal entity. In any event, the defendant is precluded from raising this argument because it was the first party to breach the Commission Contract. (*Cummings Inc. v. BP Prods. N. Am., Inc.*, 648 F.Supp.2d 969, 983 (M.D. Tenn. 2009) (applying Tennessee law and concluding that jury was properly

---

(HK) could not tolerate a ten percent commission on sales of parts to PEP-C and sought a reduction in the commission rate to three percent. (Plaintiff Exhibit 19.)

instructed that party who commits first substantial breach of contract cannot enforce the contract against the other party).[23]

### B.     Freight and Tooling Charges

DASFortus also seeks to recover $19,925.40[24] in freight and tooling charges from PPM (HK).  The plaintiff has already established that the defendant breached its agreement with it to reimburse $17,610.00 in freight charges associated with the shipment of the Davenport Machines. The plaintiff, however, has produced no evidence demonstrating why it is entitled to recover the $2,115.40 in tooling charges.  The Commission Contract appears to foreclose recovery for such charges, as by its express terms it states that "[c]ommissions do not include any tooling ... unless agreed upon by both parties."  (Plaintiff Exhibit 3.)  DASFortus has failed to present the court with proof of any such agreement regarding the requested tooling charges.

### C.     Prejudgment Interest

---

[23] The defendant also argues that it is entitled to an off-set of the commissions and all tooling and freight fees it paid to the plaintiff after the asset sale on July 31, 2006.  This argument is without merit.  The defendant does not provide any basis for this argument.  Indeed, in order for it to claim the right to such an off-set, it must assume that the plaintiff was recovering both paid and unpaid commissions and fees as damages.  Yet, the plaintiff's calculation of damages only included unpaid commissions and fees.  The defendant has not identified any portion of the plaintiff's damages calculation that includes commissions and fees already paid by PPM (HK).

[24] It appears as though the plaintiff has made a computational error in arriving at this total. In particular, in its exhibit setting forth its computation of damages, it lists that the freight charges amount to $17,810.00.  (Plaintiff Exhibit 33.)  It is clear from the record, however, that PPM (HK) agreed to reimburse the plaintiff $17,610.00 after it submitted certain tooling money owed to the defendant.

As noted above, the plaintiff has asked for prejudgment interest dating back to November of 2006 pursuant to Tenn. Code Ann. § 47-14-123 (2001). The decision whether or not to award prejudgment interest is left to the "sound discretion" of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The baseline principle is whether it is "fair," under principles of equity, to award prejudgment interest. *Id.* "[I]f the existence or amount of an obligation is certain, this fact will help support an award of prejudgment interest as a matter of equity." *Id.* at 928.

The court finds that the award of prejudgment interest is appropriate in this case. In the court's view, the existence of the obligation was certain, as PPM (HK) breached a plain and express obligation under the Commission Contract to pay commissions to DASFortus on sales it made to Stanadyne and PEP-C. In addition, the amount of the obligation was also certain, that is, it was ascertainable by computation. *Myint*, 970 S.W.2d at 928 (noting that the test for determining whether the amount of damages is certain is whether "the amount of damages is ascertainable by computation or by any recognized standard of valuation"). Other equitable circumstances also support the award of prejudgment interest. Indeed, the court received testimony that PPM (HK)'s breach of the Commission Contract materially affected the plaintiff's ability to remain in the engineered metals business. Moreover, it was established at trial that PPM (HK) continues to benefit from the plaintiff's prior efforts to establish and maintain it as a supplier to PEP-C and Stanadyne.

Therefore, the plaintiff will be awarded prejudgment interest at seven percent per year,[25] dating from January 11, 2007, the date PPM (HK) terminated the Commission Contract, through (for simplicity's sake) the end of September 2011. By the court's calculation, the plaintiff is entitled to $216,809.79 in prejudgment interest.[26]

## CONCLUSION

For the reasons discussed herein, judgment will be entered for the plaintiff, DASFortus Technologies, LLC, in the amount of $873,291.97.

An appropriate order will enter.

ALETA A. TRAUGER

United States District Judge

---

[25] The maximum amount allowable under Tennessee law is ten percent. Tenn. Code Ann. § 47-14-123. Given the state of the economy since at least 2008, the plaintiff would not have been able to realize a return of ten percent on these funds over the years.

[26] To reach this conclusion, the court took the judgment amount ($656,482.18), multiplied that by the annual interest rate (7 percent), and multiplied that number ($45,953.75) by the number of years that had elapsed since the defendant terminated the Commission Contract (4.718).